UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROGER L. WESTHAVER, JR., | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 09-12032-DPW |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

August 26, 2011

Roger Westhaver, Jr., appeals the final decision of the
Commissioner of Social Security (the "Commissioner") denying his
2007 claim for a period of disability and Social Security
Disability Insurance ("SSDI").  The Commissioner has moved for an
order affirming his decision.  After consideration of the record
before me, I must conclude that the ALJ's decision was not
supported by substantial evidence.  Accordingly,  I will vacate
the Commissioner's decision, which rested upon the determination
of Westhaver's residual functional capacity in the absence of
reliable expert opinion, and remand the case for further
development of the record, a new administrative hearing, and any
additional proceedings that may be deemed necessary.

## I. BACKGROUND

### A. Medical History

Westhaver, who was born on November 6, 1965, was in a motor

vehicle collision on May 27, 2005. (R. at 86.) As a result, he sustained a posterior fracture dislocation of the left hip, a left tibial plateau fracture, and a left patella fracture. (R. at 149.) He underwent surgery to repair the fractures and reconstruct his left hip and pelvis on May 27 and May 30. (R. at 147-53.) As he recovered from the surgeries, his range of motion in the left knee increased from seventy degrees on June 14, 2005, to 120 degrees by September 13, 2005. (R. at 142-45.) During the same time, he also increased weight bearing, reaching fifty percent weight bearing with a Bledsoe brace by September 13, 2005, at which point his physician stated that Westhaver could begin full weight bearing and had no more restrictions as to strengthening or range of motion. (R. at 142.) At the one-year status appointment, Westhaver had "excellent range of motion," "anatomic reduction [wa]s maintained[, t]he joint space [wa]s normal[, and there was n]o change in position of the hardware [in the hip]." (R. at 140.) Westhaver, however, did report continued lower back pain. (R. at 140-41, 172.)

Due to the 2005 injuries, Westhaver could not resume working as a pressman for the *Boston Herald*. (R. at 22.) Although he reported that he subsequently tried to work as a plumber's assistant, he could not continue because of the pain. (R. at 22.) The records contain reports of sporadic employment as a construction laborer doing odd jobs, but with no consistency.

### 1. Physical Impairments

Westhaver has a long history of treatment for hip and knee pain. Following his 2005 injuries, he was prescribed the narcotic painkiller percocet. (R. at 172–78.) At that time his primary care physician was Dr. Guy Spinelli, whose office recorded a number of emergency and office visits at which Westhaver complained of pain in his knee and hip and requested pain medication. (R. at 155–78.) On November 30, 2006, he requested additional painkillers, was given percocet, and was told of concerns regarding his continued use of narcotic painkillers and possible addiction. (R. at 170–71.)

The record indicates that Westhaver again sought medical assistance in August 2007, when he began treatment for knee pain at the Quincy Medical Center Pain Clinic. (R. at 381–403.) An MRI on August 14, 2007, revealed a complex tear in the medial meniscus of his right knee. (R. at 402.) On August 22, 2007, Westhaver presented with knee pain at the emergency room, was given percocet, and was told to follow up with an orthopedist. (R. at 399–401.) At that time, he was limping and using crutches due to the left knee and hip injuries but had a normal range of motion. (R. at 399.) The examining doctor questioned whether the current right knee pain was due to overuse in compensation for the left knee and hip. (R. at 399.) After missing an appointment with the orthopedist, Westhaver again visited the

emergency room on September 1, 2007. (R. at 39–98.)  He was given motrin and instructions to see the orthopedist.  (R. at 398.)

On October 3, 2007, Westhaver underwent a right knee arthroscopy, partial medial meniscectomy, and a patellofemoral chondroplasty to address a right knee medial meniscal tear and patellofemoral chondromalacia.  (R. at 393–95.)  An MRI and x-rays taken January 24, 2008, revealed that three injured areas — left hip, left knee, and right knee — were healing well.  (R. at 385–87.)  However, there was evidence of "moderately severe degenerative disease of the left hip with mild superior joint space narrowing."  (R. at 386.)

Westhaver's right knee continued to cause him pain, and he visited Manet Community Health Center three times — on December 11, 2007, January 24, 2007, and February 8, 2007 — seeking percocet or other painkillers.  (R. at 328–35.)  On February 19, 2008, an orthopedist at Quincy Medical Center concluded that he was a "poor candidate for interventional pain and/or neuropathic medications."  (R. at 382.)  Although he continued to complain of chronic right knee pain and was guarding his knee and walking with an antalgic gait, he had a "good range of motion of the knee."  (R. at 382.)  The othopedist recommended that he seek a second opinion "to see if he has something anatomically fixable as he has [no] signs of neuropathic pain at this juncture."  (R. at 382.)

4

At this point, Westhaver changed his primary care physician to Dr. Barbara Masley at Harvard Vanguard Medical Associates, where he began consulting with a pain management specialist, Dr. Harriet Scheft, and an orthopedist, Dr. Louis Bley.  (R. at 378.)

After an initial consultation on March 19, 2008, Dr. Bley remarked that he was "somewhat at a loss as to explain his pain." (R. at 372–75.)  On April 16, 2008, Dr. Bley examined a December 2007 MRI revealing no evidence of a new tear in the right knee but noted some articular chondral fissuring on the undersurface of the kneecap.  (R. at 369.)  He noted that Westhaver requested narcotics on this occasion and at the initial evaluation.  (R. at 369.)  He gave Westhaver the first of a series of three synvisc injections in the right knee.  (R. at 369.)  One week later, Dr. Bley discussed with Westhaver concerns regarding the "multitude of complaints, which are different from last visit to this visit," making meaningful analysis difficult.  (R. at 366–68.) Dr. Bley also observed that Westhaver walked with a heel-to-toe gait with no marked antalgia and that his range of motion was symmetric side to side.  (R. at 367.) On May 2, 2008, Westhaver received his third synvisc injection from Dr. Bley, who observed that Westhaver "appears to ambulate quite freely."  (R. at 363.) Dr. Bley stated that he was "skeptical that [he is] going to be able to provide him a dramatic relief of his symptoms.  I think he has multifactorial problems including some somatic and some

psychological.  He is clear to continue his activities as tolerated from an orthopedic perspective."  (R. at 363.) Westhaver did not see Dr. Bley again until July 18, 2008, when Dr. Bley determined that Westhaver "has some chondromalacia of his knees bilaterally, [but] otherwise is quite functional."  (R. at 341.)

Dr. Scheft's pain management treatment was similarly unsuccessful.  At her initial consultation, she noted that Westhaver had a history of alcohol abuse, though he had been sober for sixteen years, and had some history of cocaine use. (R. at 375-78.)  On March 24, 2008, she prescribed tramodol but would not provide an open-ended opiod prescription due to past addictions.  (R. at 371-72.)  After the synvisc injections failed to provide relief, on May 8, 2008, Dr. Scheft prescribed 15mg of morphine for one month and again discussed the risks of opiod addiction.  (R. at 361.)  On May 22, 2008, Westhaver told Dr. Scheft that the morphine relieved the pain and that "he has been able to work without problem."  (R. at 359.)

He visited the emergency room on June 1, 2008, however, seeking morphine because his hip and knee hurt after helping a friend move and he was out of morphine medication.  (R. at 355.) Dr. Masley, the examining physician, observed that he appeared to be in no acute distress, had full range of motion in the neck and trunk, full range of motion with some pain in the hip and knee,

and had full strength in the lower extremities. (R. at 354–58.) He was given percocet and naprosyn. (R. at 358.) On June 5, 2008, Dr. Scheft told Westhaver she would only prescribe two weeks worth of opiods at a time. (R. at 352–54.)

On June 25, 2008, Westhaver was in another motor vehicle accident. (R. at 349.) He presented at the scene with pain in his head, neck, and lower back but "all extremities [exhibited] full range of motion." (R. at 351.) He received percocet and was released from the emergency room. (R. at 352.) On July 2, 2008, Dr. Scheft reminded Westhaver that his treatment with opiods would be "time limited" and discussed "working at job not requiring excessive stress on his knee and hip, and utilizing non-opiod meds — he really has not made much of an effort to do any of it during the time [they] ha[d] been working together." (R. at 346.) She also reported: "I do not recommend continuing him on chronic opiod therapy. I do want to continue to follow him for mood and impulse control disorders and non-opiod [treatment] for pain." (R. at 346.) On August 7, 2008, Dr. Scheft recorded that Westhaver was not taking the prescribed naprosyn (for pain) or Wellbutrin (for depression) and had received a morphine prescription from Dr. Masley, "which he knows I do not agree with." (R. at 337.) She also reported that Westhaver "wants to stop coming to see me. Doesn't think I

understand the problems and depressed mood he is experiencing."
(R. at 337.)

On August 26, 2008, Westhaver sought help from Dr. Robert
DiTullio regarding pain in his lower back sustained in the June
25, 2008, motor vehicle collision.  (R. at 495.)  Dr. DiTullio's
medical history notes the 2005 accident, continuing pain in his
left hip and right knee, and a previous hepatitis C diagnosis.
(R. at 495.)  Although Dr. DiTullio's writing is difficult to
read, it appears he concluded that Westhaver is "totally disabled
from work."  (R. at 495.)  After a second visit on September 16,
2008, and after receiving the results from a September 22, 2008,
MRI, Dr. DiTullio diagnosed Westhaver with L4–L5 [herniated
discs] and "mild to mod[erate] central sp[inal] stenosis" and
"L5-S1 small central and right [herniated discs] contacting both
S1 n[erve]-roots."  (R. at 493.)  Dr. DiTullio saw Westhaver once
more, on October 21, 2008. (R. at 493.)

Around the same time, Westhaver changed his primary care
physician to Dr. Jonathan Parr at Brigham & Women's Hospital.
(R. at 424–26.)  There he continued to seek treatment for chronic
pain.  He presented at urgent care on September 15, 2008,
complaining of pain in his left hip.  (R. at 424–26.)  He told
the attending physician that he had been prescribed morphine and
percocet in August, and, after confirming with Harvard Vanguard,
the physician renewed his prescriptions for one month.  (R. at

424-26.)  The physician also noted that there was "[n]ot much" restriction of movement, full range of motion in both knees, and "[n]o obvious tenderness."  (R. at 424-26.)  Dr. Parr examined Westhaver on September 29, 2008, noting depression, chronic pain, but "full [range of motion], normal strength bilaterally[, n]ormal sensation to light touch bilat LE[, and n]egative straight leg raise bilaterally."  (R. at 418.)  Dr. Parr interpreted a recent pelvis x-ray as showing mild osteoarthritis of both hips and a calcified lesion overlying the left coccyx.  (R. at 419.)  He indicated that he would continue the morphine and tramadol prescriptions at the next renewal. (R. at 419.)

By October 30, 2008, Dr. Parr began expressing a desire to switch Westhaver to a non-opiod pain-management program.  (R. at 443.)  On November 14, 2008, a toxicology report revealed that Westhaver was not taking the prescribed tramadol and morphine, but had taken oxycodone.  (R. at 437.)  He was prescribed pain patches and a psychiatric evaluation to determine whether he should remain on opioids.  (R. at 437.)  On November 24, 2008, Dr. Parr began transitioning Westhaver off opioids.  (R. at 435.)

On November 7, 2008, Dr. Gregory Brick, an orthopedic surgeon, examined Westhaver.  (R. at 440-42.)  Westhaver complained of left hip pain and reported "only some lower back pain and no radiation of the pain or no numbness into the lower

extremities." (R. at 440.)  A comparison of x-rays of the lumbar spine showed "some degenerative changes . . ., L4-L5, L5-S1 with some mild disk degeneration" and a hip x-ray "showed mild arthritis." R. at 441.)  Dr. Brick concluded: "We do not think he has major pain coming from the hip currently and no surgical intervention is rendered at the time."  (R. at 441.)

### 2.  Mental Impairment

The first reports of Westhaver's depression appear in 2006. (R. at 155-78.)  One of Dr. Spinelli's colleagues prescribed antidepressants (Celexa) on March 2, 2006, when Westhaver presented with depression and anxiety due to trouble with his marriage.  (R. at 168-69.)  Following this visit, Dr. Spinelli continued to monitor Westhaver's depression, at one point changing his prescription to bupropion, until October 2006.  (R. at 155-65.)

The next evidence in the record of depression occurs in Dr. Scheft's notes of a July 22, 2008, visit, when Westhaver reported depressive symptoms due to a breakup with his girlfriend, frustration with pain, and inability to find a job.  (R. at 339-40.)  He was prescribed the antidepressant Wellbutrin.  (R. at 339-40.)

Westhaver visited urgent care at Brigham & Women's Hospital on September 18, 2008, reporting that he was "overwhelmed," and noting a number of "real-world" problems.  (R. at 423.)  He began

seeing a social worker and reported anxiety and depression due to financial, family, and legal problems.  (R. at 416-17, 421-22.) The social worker reported on September 30, 2008, that Westhaver was "scattered," "very distressed," and "unable to focus and forgot what he was supposed to do" regarding his legal proceedings.  (R. at 416.)  Although he was not taking the prescribed Wellbutrin at the time, he was at some point switched to Celexa.  (R. at 419, 435.)

### 3.  Medical Opinions

There are few comprehensive medical opinions in the record. Rather, the bulk of the record consists of visit reports and MRI and x-ray results.

In a letter dated November 9, 2006, Dr. Spinelli (at the time, Westhaver's primary care physician) stated that, as a result of the 2005 injuries, Westhaver "is permanently unable to do his job at the Boston Herald.  Currently, he has pain and limited mobility in the left hip and knee and these disabilities prevent him from doing his job which requires lifting, and other labor intensive activities."  (R. at 231.)

On June 20, 2007, Dr. Sumner Stone completed a DSS psychiatric assessment based on a review of the record as it was at that time.  (R. at 313-25.)  He concluded that there was insufficient evidence to determine whether there was a medical impairment.  (R. at 313.)  In his brief notes, he observed that

depression appeared in the medical records, but that Westhaver failed to appear at two scheduled consultative examinations, one medical and one psychiatric. (R. at 325.)

Dr. DiTullio wrote two letters, dated September 29, 2008, and October 16, 2008, in which he stated that Westhaver is "totally disabled from gainful employment" due to radiculopathy and herniated discs at L4-L5 and L5-S1 that are "evident clinically and by MRI." (R. at 490-91.) These injuries arose, he reported, from a motor vehicle accident on June 24, 2008. (R. at 490.)

Dr. DiTullio also completed a two-page residual functional capacity ("RFC") evaluation on January 25, 2009, as amended January 27, 2009. (R. at 500-01.) On the first page, in a series of checklists, Dr. DiTullio indicated that Westhaver could sit, stand, and walk each for a total of one hour per day; could occasionally lift and carry six to ten pounds; cannot push or pull arm or leg controls; could occasionally bend and reach but cannot squat, crawl, or climb; and had moderate environmental limitations. (R. at 500.) He gave no analysis and cited to no objective medical evidence other than his diagnosis of L4-L5 herniated discs with "mild to moderate central spinal stenosis" and "L5-S1, herniated discs contacting both S1 nerve roots." (R. at 501.) Dr. DiTullio observed that depression aggravated the presence of pain but did not reference any pain in or medical

12

history of fractures of the hip or knees.  (R. at 501.)  He

concluded that Westhaver was disabled.  (R. at 501.)

**B.  Procedural History**

On February 17, 2007, Westhaver filed an application for a

period of disability SSDI claiming disability beginning May 27,

2005.[1]  (R. at 86.)  Following the accident, Westhaver received

long term disability insurance until September 2006.  (R. at

22-23, 86.)

The state agency and Federal Reviewing Officer issued

decisions unfavorable to Westhaver on June 22, 2007, and July 16,

2008, respectively.  (R. at 53, 42-49.)  Both decisions noted

that Westhaver had failed to attend scheduled and/or requested

---

[1]The application actually seeks "a period of disability
and/or all insurance benefits for which I am eligible under Title
II and Part A of Title XVIII of the Social Security Act."  (R. at
86.)  The application further states: "I became unable to work
because of my disabling condition on May 27, 2005.  I am not
still disabled.  My disability ended in September 2006. . . .  I
do not want to file for SSI."  However, Westhaver, the Social
Security Administration, and the Administrative Law Judge all
appear to have proceeded as if Westhaver is seeking SSDI and is
currently disabled.  In fact, the medical evidence cited by the
ALJ in his decision almost exclusively addresses Westhaver's
impairments as of 2008 and the testimony of Westhaver and the
vocational expert also address his current condition and
capabilities.  (R. at 10, 13-15.)  This apparent anomaly is
likely due to the fact that the torn meniscus procedure on
Westhaver's right knee (October 3, 2007) and the motor vehicle
accident that triggered his lower back pain (June 25, 2008) took
place after Westhaver applied for a period of disability.
Because I will remand this case on other grounds, I need only
highlight the discrepancy here and will proceed as did the
parties on the basis that Westhaver seeks disability benefits for
the period beginning May 27, 2005, and thereafter.

medical and psychiatric consultative examinations.  (R. at 53, 46, 48.)

## 1.  **Hearing Testimony**

A hearing was held before an Administrative Law Judge ("ALJ") on May 11, 2009.  (R. at 20.)  With respect to the extent of his current pain, Westhaver testified that his knee and hip were still painful, always "achy," and sometimes "stabbing."  (R. at 24.)  He also reported that, following the June 2008 accident, he had discomfort in his neck and a "dull pain" or "constant pressure" in his low back.  (R. at 25.)  In order to relieve the pain, Westhaver stated that he moves around a lot during the day, changing positions, going for walks, and, every couple of days, must lay down on the ground for approximately fifteen minutes. (R. at 26–27.)  He also takes pain medication.  (R. at 29.)  He testified that he could sit or stand for approximately twenty minutes at a time, finds bending and going up stairs difficult, and can grab and lift things that are not too heavy.  (R. at 32.) He uses a cane to walk when necessary.  (R. at 33.)  Westhaver also stated that he still feels depressed and anxious, although he does socialize occasionally.  (R. at 29–30.)

The ALJ posed three hypothetical questions to the vocational expert, Ruth Baruch.  (R. at 36–38.)  First, he asked:

> Please consider a hypothetical individual whose age
> ranges from 40 to 43.  Possessing a GED, and three
> years of . . . community college.  The same training
> and work experience as Mr. Westhaver.  Exertional

14

> impairment puts him into the light exertional level.
> And the following nonexertional impairments that he may
> only occasionally climb, balance, stoop, kneel, crouch
> or crawl.  And that as a result of his depression, he
> should not be in a job requiring frequent contact with
> the public. . . . [In] the world of unskilled work.
> . . .  At either the light or sedentary level.

(R. at 37–38.)  Ms. Baruch listed four existing jobs — inspector,
hand packager, bench assembler, and mail sorter — that such an
individual could perform.  (R. at 38.)  Next, Ms. Baruch
confirmed that if one were to assume Dr. DiTullio's RFC
assessment were accurate, Westhaver would be unable to work.  (R.
at 39.)  Ms. Baruch also concluded that, assuming Westhaver's
testimony was entirely credible, he would not be able to work.
(R. at 39.)

### 2.  The ALJ's Decision

On June 16, 2009, the ALJ issued an opinion unfavorable to
Westhaver.  (R. at 7.)  He found that Westhaver had not engaged
in substantial gainful employment since the alleged onset date of
May 27, 2005.  (R. at 9–10.)  He found three medically
determinable severe impairments: residual fractures in the hip
and knee, depression, and substance abuse.  (R. at 10.)  Although
there was no "formal evaluation by a psychiatrist or psychologist
leading to any diagnosis or treatment" in the record, "based on
claimant's testimony as well as his history of medical trauma and
the medical record that mentions some difficulty (albeit without
making a specific diagnosis), the [ALJ] grant[ed] the claimant

15

the benefit of the doubt and f[ound] that he has some symptoms that in conjunction with his chronic pain and the effects of treatment could constitute 'severe' impairment." (R. at 11.)

The ALJ next found that none of the identified severe impairments met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.  (R. at 10.)  In considering whether Westhaver's depression was severe, the ALJ considered the "paragraph B" criteria listed in 20 C.F.R. § 404.1520a(b) and found no restriction of daily activities; moderate difficulties in social functioning causing "some difficulty [*sic*] frequent contact with the general public"; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (R. at 12.) The ALJ concluded that Westhaver's difficulties with concentration, pace, or persistence "could cause moderate limitations on the claimant's ability to understand, remember or carry out detailed instructions," but that Westhaver "retains the capacity to sustain attention for extended (two-hour) periods and to keep to a regular work schedule."  (R. at 12.)

The ALJ next determined that Westhaver retains the RFC to perform light work "except that the claimant should not have to more than occasionally balance, stoop, kneel, crouch or crawl[, and] as per his assertions, must avoid frequent contact with the general public."  (R. at 12.)  In determining the RFC, the ALJ

relied on his analysis of the paragraph B factors, the medical records, and Westhaver's testimony regarding his pain and how long he could sit, stand, and walk.  (R. at 13.)  He concluded that Westhaver was a "sincere witness," but "his assertions, when viewed in the context of the specific objective signs, symptoms and laboratory findings, cannot be accepted as credible to the extent alleged."  (R. at 13.)

Thus, in determining the RFC, the ALJ relied heavily on the 2008 medical reports of the treating and examining physicians at Brigham & Women's Hospital.  (R. at 13.)  He noted that these physicians stated that Westhaver "had no limitations with respect to range of motion or any focal deficits with respect to strength, sensation or reflexes" and no "spasm or significant tenderness."  (R. at 13.)  The ALJ also noted that radiographic reports showed that there was only "mild arthritis in the hips and mild degenerative changes in the lumbar spine."  (R. at 13.)  Because Dr. DiTullio's report, stating that Westhaver is totally disabled, was inconsistent with the Brigham & Women's Hospital physicians' notes, the ALJ rejected Dr. DiTullio's conclusions regarding Westhaver's disability and functional limitations.  (R. at 13.)

Given this RFC, the ALJ found that Westhaver could not perform his past work of laborer, pressman, or plumber's assistant, which all required medium to very heavy work.  (R. at

14.)  The ALJ then examined Westhaver's age, education, and the abovementioned RFC to determine that Westhaver could perform some light work but his "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  (R. at 14.)  He relied on the vocational expert's responses to his hypotheticals posed during the hearing to determine "the extent to which these limitations erode the unskilled light occupational base."  (R. at 14.)  He adopted the vocational expert's opinion that Westhaver could perform the work of inspector, hand packager, bench assembler, and mail sorter.  (R. at 14–15.)  Consequently, the ALJ found Westhaver "not disabled."  (R. at 15.)  The decision of the ALJ became final decision of the Commissioner.

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  In undertaking this review, the Commissioner's factual findings are treated as conclusive so long as they are "supported by substantial evidence."  42 U.S.C. § 405(g).  Thus, I must uphold the ALJ's findings if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  *Ortiz v. Sec'y of Health &*

*Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (*per curiam*) (citation omitted).

Although I must defer to the ALJ's credibility findings "even if the record arguably could justify a different conclusion," *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (*per curiam*) (citation and quotation marks omitted), I "may review conclusions of law . . . and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to the experts.'" *Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (*per curiam*))(additional citations omitted).

### III. DISCUSSION

An individual is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration ("SSA") has established a five-step sequential inquiry to determine whether a claimant is disabled and thereby eligible for disability benefits. *See* 20 C.F.R. §§ 404.1520. The ALJ must determine (1) whether the claimant is engaged in substantial gainful activity; (2) whether

the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the impairment or impairments fall within the listings in 20 C.F.R. Part 404, Subpart P, App. 1; (4) if the impairment or impairments do not fall within the listings, whether the claimant has the residual functional capacity to perform past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's RFC, age, education, and work experience. *Id.* In making this determination, the ALJ must consider the record as a whole, but is "not at liberty to substitute his own impressions of an individual's health for uncontroverted medical opinion." *Carillo Marin v. Sec'y of Health & Human Servs.*, 758 F.2d 14, 16 (1st Cir. 1985) (*per curiam*).

An individual seeking disability benefits "bears the initial burden of establishing through credible evidence, that he was disabled within the meaning of the Social Security Act." *Musto*, 135 F. Supp. 2d at 220; *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir. 1982). However, at step 5 of the inquiry, "the burden shifts to the Secretary to show the existence of other jobs in the national economy that the claimant can nonetheless perform." *Sherwin v. Sec'y of Health & Human Servs.*, 685 F.2d 1, 2 (1st Cir. 1982). The ALJ here found that

Westhaver's claim failed at this last step, where the ALJ bears the burden.

Westhaver appeals the ALJ's decision, arguing that it was not supported by substantial evidence because: (1) the ALJ improperly discounted the only RFC assessment in the record and, consequently, determined the RFC based on his own lay interpretation of the raw medical evidence, and (2) the ALJ relied on the opinion of a vocational expert that was based on an erroneous hypothetical.

## C.  The ALJ's RFC Determination

Westhaver argues that the ALJ's RFC determination was improper because he disregarded the uncontroverted opinion of Dr. DiTullio — the only RFC evaluation in the record — and instead based his RFC on his own analysis of the medical evidence. Westhaver further maintains that, if the ALJ found Dr. DiTullio's evaluation unsubstantiated, the ALJ had a duty to contact Dr. DiTullio to further investigate the discrepancies in the record.

After reviewing the ALJ's decision and the record, I must conclude that although the ALJ did not err in disregarding Dr. DiTullio's brief and conclusory RFC assessment, the ALJ's own RFC assessment was not itself based on substantial evidence.

### 1.  Assessing RFC at Step 4

In step 4 of the five-step analysis, the ALJ must "consider [his] assessment of [the claimant's] residual functional capacity

and . . . past relevant work" to determine whether the claimant can still perform his past work. 20 C.F.R. § 414.1520(e)(4)(iv). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Ruling 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). The RFC represents "not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* at *1. An ALJ assesses RFC "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' — *i.e.*, opinions about what the individual can still do despite his or her impairment(s) — submitted by an individual's treating source or other acceptable medical sources." *Id.* at *2.

If the ALJ's RFC assessment used in step 4 of the inquiry is not supported by substantial evidence, the ALJ cannot meet his burden on step 5 because the vocational expert's conclusion that Westhaver could perform jobs existing in the national economy would then be based on an unsupported RFC. *See Coggon v. Barnhart*, 354 F. Supp. 2d 40, 61 (D. Mass. 2005) ("In order to rely on a vocational expert's testimony, a hearing officer must

22

base her hypothetical on a substantially supported assessment of the claimant's functional limitations." (citing *Rose v. Shalala*, 34 F.3d 13, 19 (1st Cir. 1994))).

### 2. Dr. DiTullio's Medical Opinion and RFC Assessment

Westhaver correctly points out that the SSA "[g]enerally . . . give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). However, "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." *Shaw v. Sec'y of Health & Human Servs.*, 25 F.3d 1037, 1994 WL 251000, at *3 (1st Cir. 1994) (*per curiam*); *see also Green v. Astrue*, 588 F. Supp. 2d 147, 154 (D. Mass. 2008) ("[T]he hearing officer may choose not to give [a treating physician's medical opinion] controlling weight if the hearing officer finds that it is inconsistent with other substantial evidence in the record.").

Moreover, a treating physician's conclusion regarding disability or RFC (as opposed to, *e.g.*, conclusions on functional limitations), cannot be controlling because that is an ultimate decision reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1)-(2) ("Opinions on some issues, such as [opinions

that a claimant is disabled and RFC], are not medical opinions
. . ., but are, instead, opinions on issues reserved to the
Commissioner."); Ruling 96-5p, *Titles II and XVI: Medical Source
Opinions on Issues Reserved to the Commissioner*, 1996 WL 374183,
at *2 (S.S.A. July 2, 1996) ("[T]reating source opinions on
issues that are reserved to the Commissioner are never entitled
to controlling weight or special significance.").  Dr. DiTullio's
letter opinions were brief — no more than five sentences each —
and simply listed the diagnoses and a statement that Westhaver
"is totally disabled from any gainful employment."  Such a
conclusory statement on disability is not entitled to any
deference.  *See Shaw*, 1994 WL 251000, at *2 ("[The] report
carried the prediction of 'total disability' into the statutory
period, but did not specify any functional limitation.  Viewed as
a mixed legal-medical conclusion, it was not binding on the ALJ."
(citing 20 C.F.R. § 404.1527(d)(2))).  Thus, "[t]o the extent
that [Dr. DiTullio's] opinion is urged as reflecting an answer to
the statutory question, it was not binding on the ALJ."  *Id.* at
*6 n.3 (summarizing 20 C.F.R. § 404.1526(e)(1)).

When a treating physician's medical opinion or RFC
assessment is not entitled to controlling weight, the ALJ must
next assess the probative value of the opinion by considering a
number of statutory factors: "(1) length of the treatment
relationship and the frequency of examination; (2) nature and

24

extent of the treatment relationship; (3) supportability; (4) consistency; and (5) specialization." *Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ here observed that Dr. DiTullio's assessment was inconsistent with those of the Brigham & Women's Hospital treating physicians, who found little restriction in movement or strength. (R. at 13.) The ALJ also noted that the assessment was inconsistent with Dr. DiTullio's own interpretation of the MRI (the only objective evidence cited by Dr. DiTullio in support of his assessment), which he concluded showed only mild to moderate disc herniation. (R. at 13.) The ALJ's conclusion is supported by the reports of the Brigham & Women's Hospital physicians and especially the two November 2008 reports by examining physicians who specifically assessed Westhaver's lower back pain. (R. at 437–42.) Dr. Brick, an orthopedic surgeon, reported Westhaver "only has some lower back pain and no radiation of the pain or no numbness into the lower extremities" and concluded that an MRI revealed "some mild disk degeneration." (R. at 440.) This is sufficient evidence to support a decision to give Dr. DiTullio's opinions little weight.

Moreover, Dr. DiTullio's RFC assessment only addressed his lower back pain, which, in any event, the ALJ did not find to be a severe impairment in step 2. Dr. DiTullio noted that

depression aggravated the lower back injury, but did not mention the hip or knee pain in the RFC assessment. (R. at 501.) Nor did he provide any reasoning or analysis for the identified functional limitations. (R. at 500-01.) Dr. DiTullio saw Westhaver only four times over the span of one month, according to the record, and provided no analysis of the hip and knee injuries that purportedly underlie Westhaver's disability claim. He did not conduct a mental RFC assessment. Consequently, even though it is the only RFC assessment as such in the record, Dr. DiTullio's assessment cannot be considered sufficient to support a finding of disability.

Thus, the ALJ's decision to give Dr. DiTullio's RFC assessment and brief letters little weight is supported by substantial evidence. However, by disregarding Dr. DiTullio's RFC assessment, the ALJ disregarded the only expert RFC assessment — however incomplete — in the record.

### 3. The ALJ's RFC Assessment

While an ALJ may make determinations regarding credibility, "the ALJ [i]s simply not qualified to interpret raw medical data in functional terms." *Nguyen*, 172 F.3d at 35; *see also Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir. 1991) (*per curiam*) ("Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual

functional capacity based on the bare medical record.").  The First Circuit "h[as] held, accordingly, that where an ALJ reaches conclusions about claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence." *Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446-47 (1st Cir. 1991) (*per curiam*) (citations omitted).  This principle also has been extended to mental RFC determinations.  *See Roberts v. Barnhart*, 67 Fed. App'x 621, 622-23 (1st Cir. 2003) (*per curiam*).

There is a narrow exception to the requirement of a reliable expert functional assessment: "[W]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (*per curiam*); *see also Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (*per curiam*) (holding that the hearing officer is not precluded from rendering "common-sense judgments about functional capacity based on medical findings, as long as [he] does not overstep the bounds of a lay person's competence and render a medical judgment").  Thus, "[i]f th[e] evidence suggests a relatively mild physical impairment posing,

27

to the layperson's eye, no significant exertional restrictions, then [the court] must uphold the ALJ's finding; elsewise, [the court] cannot (in the absence of an expert's opinion)." *Manso-Pizarro*, 76 F.3d at 17–18.

The Commissioner argues that this exception applies to Westhaver's case. I cannot agree. The medical record demonstrates a complex interplay of both physical and mental limitations, as the ALJ himself recognized in his decision. The record suggests that there are significant exertional limitations with respect to weight bearing, bending, sitting, walking, and lifting. Accordingly, the ALJ made specific findings regarding the amount of weight Westhaver can lift (light work) and the amount of time he could work without rest (2 hours). These conclusions require more than a layperson's capabilities. *See Gordils*, 921 F.2d at 329 ("Although we think it permissible for the Secretary as a layman to conclude that a 'weaker back' cannot preclude sedentary work, we would be troubled by the same conclusion as to the more physically demanding light work."); *Coleman v. Astrue*, 726 F. Supp. 2d 36, 46 n.7 (D. Mass. 2010) ("It would blur the line between common sense and medical judgment to decipher the lengthy medical record, rampant with numerous doctor's notations, to determine that [the claimant] is capable of frequently lifting ten pounds of weight and walking and standing a great deal."). Westhaver did not present

uncomplicated symptoms from which the ALJ could interpret functionality without expert assistance.

To the extent that the ALJ relied on physicians' observations regarding Westhaver's range of motion, strength, and lack of suitability for surgical intervention, those observations were raw medical data and not functional assessments. *See Staples v. Maine*, No. 09-440-P-S, 2010 WL 2680527, at *3 (D. Me. June 29, 2010), *aff'd by*, 2010 WL 2854439 (D. Me. July 19, 2010) ("The [ALJ] essentially rejected all of these expert reports. . . . Thus, in essence, she crafted the finding of the plaintiff's mental RFC from the raw treatment and assessment evidence of record. . . . Her mental RFC finding accordingly was unsupported by substantial evidence.").

There is also evidence of nonexertional limitations such as Westhaver's apparent chronic pain, which the ALJ barely addressed, chronic opiod use, and "severe" depression. The ALJ made a detailed mental RFC assessment, but it "cannot be traced to, and is unsupported by, any medical expert opinion of record." *Id.* at *5. As the ALJ himself noted, "there is no evidence of any formal evaluation by a psychiatrist or psychologist leading to any diagnosis or treatment." (R. at 11.) Nonetheless, the ALJ considered Westhaver's testimony and concluded that he had severe depression including moderate limitations in (1) concentration, persistence, and pace, and (2) social

interactions.  (R. at 11.)  These conclusions, which the ALJ included in his RFC assessment by limiting Westhaver to unskilled work away from the general public (R. at 11–12), were based solely on his own interpretation of the medical evidence.  Thus, the ALJ's mental RFC assessment is not based on substantial evidence.

Consequently, the ALJ's RFC assessment in step 4 is not supported by substantial evidence and I must vacate his decision and remand the case for further investigation regarding Westhaver's physical and mental functional capacities.  Because the ALJ's decision at step 4 was not adequately supported, I need not address Westhaver's claim of error at step 5.  The ALJ's decision will be vacated, and the case remanded.

### 4.  The Duty to Ensure a Complete Record

A claimant is "responsible for providing the evidence [used] to make a finding about [his] residual functional capacity."  20 C.F.R. § 404.1545(a)(3).  "However, before [the ALJ] make[s] a determination that [a claimant is] not disabled, [the ALJ is] responsible for developing [a] complete medical history, including arranging for a consultive examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports."  *Id.*  If there is insufficient evidence to make a determination on disability, the SSA "will request additional existing records, recontact your treating sources or any other

examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information." 20 C.F.R. § 404.1527(c)(3).

The SSA here made "every reasonable effort" to acquire a complete record by requesting and scheduling psychiatric and medical consultative examinations, which it is authorized to do under 20 C.F.R. § 404.1517. (R. at 325.) The Federal Reviewing Officer notes that not only did Westhaver fail to appear at these appointments, but he also "failed to respond to telephone messages left for him and has not responded to a 10 day deadline letter." (R. at 325.) There is no evidence in the record regarding why Westhaver failed to appear or to respond to the requests.[2]

Thus, in remanding this case to the ALJ, I am aware that Westhaver has proved less than cooperative with the SSA in meeting his burden to provide evidence supporting his claim. As the Commissioner observes, it is unfair that Westhaver apparently

---

[2]The regulations permit rescheduling of a consultative examination in limited circumstances:

> [I]f you have any reason why you cannot go for the scheduled appointment, you should tell us about this as soon as possible before the examination date. If you have a good reason, we will schedule another examination. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have a good reason for failing to attend a consultative examination.

20 C.F.R. § 404.1418(a); *see also* 20 C.F.R. § 404.1418(b) (listing examples).

refused to provide required evaluations and yet now seeks remand for lack of sufficient evidence. The regulations are clear that a claimant should not benefit from his own lack of cooperation with the claims procedures:

> If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, *we may find that you are not disabled*.

20 C.F.R. § 404.1518(a) (emphasis added). Consequently, if on remand Westhaver continues his pattern of failing appear at scheduled consultative examinations — or fails to provide any other evidence reasonably requested by the SSA — he does so at his own peril. In such a circumstance, failure to appear at a scheduled consultive examination would be a proper ground for denial of his claim on this record.

### IV. CONCLUSION

For the reasons set forth more fully above, I DENY the Commissioner's motion to affirm (Dkt. No. 17), and I GRANT in part Westhaver's motion (Doc. No. 15) to the extent that the Commissioner's decision is VACATED and REMANDED for further development of the record, a new administrative hearing, and any further proceedings consistent with this opinion that may be deemed necessary.

/s/ *Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE